PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

FILED
United States Court of Appeals
Tenth Circuit

MAY 17 1994

ROBERT L. HOECKER
Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DONALD RAY BROWN,

    Defendant-Appellant.

No. 93-5133

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 93-CR-19-E)

Kenneth P. Snoke, Assistant United States Attorney (Stephen C. Lewis, U.S. Attorney, and James L. Swartz, Assistant U.S. Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

Jack Marwood Short, Tulsa, Oklahoma, Attorney for Defendant-Appellant.

Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and ROGERS, Senior District Judge.*

McWILLIAMS, Senior Circuit Judge.

---

\*    Honorable Richard D. Rogers, Senior District Judge, District of Kansas, sitting by designation.

In a one-count indictment, Donald Ray Brown was charged with knowingly and intentionally possessing cocaine, a Schedule II Controlled Substance, with an intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) (1988). Brown filed a motion to suppress the use at trial of the $7,815 in currency and the eight Ziploc baggies of cocaine found under the front seat floor mat of his Lincoln Continental automobile. The gist of the motion was that the government's use of a canine to "sniff" his car violated Brown's Fourth Amendment rights.

After an evidentiary hearing, the district court denied the motion. Brown then entered a conditional plea of guilty, reserving the right to have appellate review of the order of the district court denying his motion to suppress. Fed. R. Crim. P. 11(a)(2). Brown was sentenced to imprisonment for 33 months and fined $10,000, all to be followed by supervised release for five years, plus a $50 special assessment. Brown appeals.

At the evidentiary hearing on the motion to suppress, the government called two witnesses: Harold Adair, a police officer for the Tulsa, Oklahoma, police department, and Robert Boston, a United States Probation Officer for the Northern District of Oklahoma. Brown called no witnesses.

From the testimony of Adair and Boston, we learn that Boston was the parole officer for Brown, who was a federal parolee.[1] On Friday, January 29, 1993, Boston spent much of

---

[1] In his brief, counsel advises us that Brown was on parole from a federal drug conviction.

the day attempting to locate Brown who had apparently failed to appear at the parole and probation office and produce a urine specimen for analysis. A few minutes before 4:00 p.m. on that date, Boston located Brown in the Woodland Lounge, a bar in suburban Tulsa. Boston informed Brown that he was scheduled for a urine test, and Brown made at least mild protest, stating, inter alia, that "he couldn't pass the test." However, Boston insisted and at his direction Brown drove his Lincoln automobile to the parking lot adjacent to the offices of the probation department. Boston testified that before leaving the parking lot of the Woodland Lounge, he saw Brown, when he was in the driver's seat and behind the steering wheel of his Lincoln, bend over until he "could barely see the back of his head sticking up . . ." and appeared to be placing something under the front seat.

Brown, followed by Boston, drove to the parking lot adjacent to the probation department's offices, arriving at about 4:15 p.m. Boston had instructed Brown to park next to him in the lot. Brown, however, parked about 150 to 200 feet away from Boston. Boston then walked over to Brown's vehicle and the two of them walked into the offices of the probation department. They were joined there by Rod Baker, the chief probation officer, and by Dayton Wagoner, another probation officer. At that time, Boston advised Brown, and the others, that based on Brown's actions in the Lincoln at the lounge, he (Boston) suspected Brown of having narcotics in his car

and asked Brown for permission to search the car. Brown refused to give permission to search his car.

Brown, apparently with some difficulty, eventually produced a urine specimen sometime between approximately 4:35 and 4:45 p.m. In the meantime, Baker had called the Tulsa Police Department and informed the police of their suspicion that Brown had narcotics in his Lincoln. At one point in this time frame, Brown asked if he could talk with Rod Baker in private, and Brown went to Baker's office where they had a private conversation lasting, according to Boston, some twenty minutes.

Officer Adair of the Tulsa Police Department testified that he responded to Baker's call, and when en route to the scene called for the canine team. Adair said he arrived at the parking lot of the probation department a few minutes before 5:00 p.m. When he arrived, Adair called the probation department on his cellular phone and informed that office that he was in their parking lot. Boston, Brown, and others then came out of the building and all convened around Brown's Lincoln.

At that time and place Officer Adair and Brown engaged in conversation. Officer Adair testified that he advised Brown that he (Adair) was a police officer and that he had reason to believe there were controlled substances inside the vehicle. He stated that he asked Brown if he would consent to a search of the vehicle, and Brown stated he would not consent. Adair testified that he then advised Brown that he

-4-

was going to have a canine "sniff" the car. At that point, according to Adair, Brown volunteered that he could not give consent because he had loaned his vehicle to someone the night before and "they had used the vehicle to transport drugs. . . ."

It was in this general setting that Officer Adair had the canine "sniff" the Lincoln, and the canine "alerted" to the vehicle. Adair testified that he advised Brown that he was going to secure the vehicle, obtain a search warrant and search the vehicle. Brown then inquired as to whether there was anything he could do to avoid having his car searched and made some statements which Adair considered to be a bribe offer. In any event, Officer Adair volunteered to call a cab for Brown, which he did, and Brown then left the scene by taxi. Shortly thereafter, a tow truck arrived and towed the Lincoln to the police impound lot.

Adair testified that he then returned to his office and at about 6:00 p.m. began preparing his affidavit for a search warrant. Later that same evening, around 8:00 p.m., Adair obtained a search warrant. At that time, Officer Adair had some conversation with the issuing judge concerning whether the warrant could be executed at nighttime. In any event, the search of the vehicle was not made until the following morning. That search disclosed $7,815 in currency, eight baggies containing cocaine, and three more baggies containing methamphetamine, all hidden under the floor mat of the front seat.

Brown's written motion to suppress was based on counsel's belief that the canine "sniff" was in and of itself an unreasonable search in violation of Fourth Amendment rights. At the evidentiary hearing on the motion to suppress, counsel more or less abandoned that particular argument. However, he advised the district court that it was his further contention that Brown and his Lincoln had been "unreasonably detained" in violation of the Fourth Amendment and that the subsequent seizure of the currency and cocaine from the Lincoln was the "fruit of the poisonous tree."

As concerns a canine sniff being a search, in *United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990), we held that under the circumstances of that case a canine sniff was not a "search" within the meaning of the Fourth Amendment. In thus holding, we relied on *United States v. Place*, 462 U.S. 696 (1983), where at pages 706 and 707 the Supreme Court held that the investigative procedure of subjecting luggage to a "sniff test" by a well-trained narcotics detection dog did not constitute a search within the meaning of the Fourth Amendment. *See also United States v. Stone*, 866 F.2d 359, 363 (10th Cir. 1989). So, in the instant case, the canine's sniff of Brown's Lincoln was not itself a search within the meaning of the Fourth Amendment.

The fact that Brown was a parolee does not really play a role in the present controversy. In this regard, counsel concedes that Boston, Brown's parole officer, had the authority to order Brown to go to the parole and probation office

and produce a urine specimen for analysis. As indicated, Boston first encountered Brown a few minutes before 4:00 p.m. on January 29, 1993. The two of them arrived at the offices of the parole and probation department around 4:15 p.m. There was colloquy between Boston and Brown in the parole office, involving Boston's supervisor, Baker, and another parole officer. The urine was apparently produced no later than 4:45 p.m. So, any "unreasonable detention" of Brown necessarily occurred after approximately 4:45 p.m.

Officer Adair arrived at the parking lot about 4:55 p.m. We have already related what occurred at that time and place. After being advised that the Lincoln was going to be towed to the police pound and a search warrant obtained, Brown left in a taxi.

It is arguable that Brown was never himself detained in any manner. Boston testified that he had no authority to arrest parolees, though he did have authority to arrest probationers. Officer Adair did ask whether Brown would consent to a search, which consent was not given. But assuming that somewhere between 4:45 p.m., when Brown submitted his urine specimen, and 5:15 p.m. when he left by taxi, there was some sort of "detention," such would clearly come within the *Terry-type* investigative stop approved in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. In line therewith, the Supreme Court in *United States v. Sharpe*, 470 U.S. 675, 686 (1985), rejected a suggestion that a 20-minute detention of a defendant was, *per se*, too long to be justified under the

*Terry* doctrine. *See also United States v. Rutherford*, 824 F.2d 831, 834 (10th Cir. 1987).

As concerns Brown's claim of unreasonable detention of his Lincoln automobile, we believe *United States v. Place*, 462 U.S. 696 (1983) controls. The Supreme Court in *Place* spoke as follows:

> In sum, we conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

*Id.* at 706.

In *Place*, the Supreme Court held that under the facts and circumstances of that case the "investigative detention" was not "properly limited in scope," the detention lasting for some 90 minutes. We hold that any "investigative detention" of the Lincoln was based on reasonable suspicion and "was properly limited in scope," only lasting about 30 minutes at the most.[2] In *Place*, the Supreme Court rejected a suggestion that 20 minutes is the maximum time for a *Terry* stop. *Id.* at 709.

Of course when the canine alerted to Brown's Lincoln, the authorities had "probable cause" to impound the vehicle,

---

[2] In deciding whether an investigative stop is reasonable, the Supreme Court has adopted a two-part test: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference . . . ." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

which they did, and thereafter obtained a search warrant, the execution of which disclosed the cocaine which formed the basis for the present indictment.

Judgment affirmed.